UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA,        )
                                 )
                 Government,     )
                                 )
VS.                              ) Cause:    2:11cr53
                                 )
JOHN SMITH,                      )
                                 )
                 Defendant.      )


        The sentencing in the above-entitled matter was commenced before Honorable  Philip P. Simon, Chief Judge of said court, at the Federal Building, 5400 Federal Plaza, Hammond, Indiana, on the    22ND day of November, 2013 commencing at the hour of  9:30 in the forenoon.

Sharon Boleck Mroz, CSR, RPR, CPE
Official Court Reporter
US District Court
Northern District of Indiana
Hammond Division
5400 Federal Plaza
Hammond, IN 46320
(219) 852-6728

1                              Appearances:

2                 Mr. David J. Nozick
                  Mr. Gary T. Bell
3                 Office of the United States Attorney
                  5400 Federal Plaza,  Ste 1500
4                 Hammond, IN  46320

5                          On behalf of the  Government;

6                 Mr. John Maksimovich
                  1946 North Main Street
7                 Crown Point, IN 46307

8                          On behalf of the Defendant.

9     Defendant present in person.

10
                  Also present:  David McDaniel - ATF
11                                David Beier - Probation.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           INDEX

2     David McDaniel
            Bell---------------------------------------12
3           Maksimovich--------------------------------16

4     Jeremy Godsave
            Bell---------------------------------------19
5
      Sentence imposed---------------------------------44
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBITS

Defendant's Exhibit A ---------------------------------------27

1      THE CLERK:  All rise.

2      THE COURT:  All right.  You can be seated.

3      All right.  Good morning everyone.

4      MR. NOZICK: Good morning.

5      MR. MAKSIMOVICH:  Good morning, Your Honor.

6      THE COURT:  We are on the record in cause number

7   2:11 CR 53, United States versus John Smith.

8      We're here today for the sentencing of the Defendant.  He

9   is present in court with his lawyer, John Maksimovich.

10      Gary Bell and Dave Nozick are here for the Government.

11  Before we proceed with the sentencing hearing, there is a couple of

12  matters I want to take up with the parties.

13      There was an outstanding motion for judgment of acquittal

14  on Count 6 that I had deferred ruling on at the time of trial.  I

15  think I disposed of the motion as it related to Counts 1 through 5,

16  but I reserved ruling on Count 6.

17      So, Count 6 was a charge of a violation of 18 USC Section

18  924 H.  Count 6, which was the only count that was brought against

19  Mr. Smith alone.

20      It charged him with transferring 13 firearms on March the

21  8th of 2011, knowing that the firearms would be used in a drug

22  trafficking crime, and the crime alleged in indictment was the

23  conspiracy outlined in Count 1.

24      And that conspiracy was a conspiracy that Mr. Smith was

25  in with Mr. Carlyle to possess with the intent to distribute five

kilograms or more of cocaine.

The charge states that Smith knowingly transferred the 13 firearms, quote "knowing that the firearms would be used in a drug trafficking crime, that is the conspiracy to possess with the intent to distribute and distribute five kilograms or more of cocaine as described in Count 1 of the indictment."

So, at the close -- as I mentioned, at the close of the Government's evidence, Mr. Smith moved for a judgment of acquittal pursuant to Rule 29 A of the Federal Rules of Criminal Procedure.

I denied the motion as it related to Counts 1 through 5 but reserved ruling on Count 6 pursuant to rule 29 B.

Mr. Smith then renewed his motion at the close of evidence, and I again reserved judgment on the issue.

Mr. Smith was then convicted on all six counts of the indictment, and he has then again filed a motion for judgment of acquittal on all six counts. That's docket entry number 108. And the Government filed a response opposing the motion in docket entry number 131.

I conclude that there is sufficient evidence on Counts 1 through 5 to stand, and so, I'm going to deny the motion as it relates to Counts 1 through 5 for the reasons I articulated at the trial, but I'm going to grant the motion as it relates to Count 6 for the reasons I'll state here in a minute.

The statute at issue, 18 USC Section 924 H provides the following: Whoever knowingly transfers a firearm knowing that such

firearm will be used to commit a crime of violence or drug
trafficking crime shall be imprisoned for more -- not more than 10
years.

The standard is on a motion for judgment of acquittal, I
must ask whether the evidence presented when viewed in the light
most favorable to the Government could support any rational trier
of fact's finding of the essential elements of the crime beyond a
reasonable doubt.

See for example United States versus Alhalabi,
A L H A L A B I, 443 Fed. 3d, 605 at 613. It's a Seventh Circuit
case from 2006.

So, Mr. Smith argues that the conspiracy outlined in
Count 1 of the indictment was the conspiracy between Mr. Smith and
Mr. Carlyle to provide security for the drug transactions that took
place on January 21st and February 16th of 2011.

The firearms transaction that took place on March 8th
involved Mr. Smith and undercover agents only.

There was no evidence presented that Carlyle had anything
to do with the sale of the firearms, therefore, Mr. Smith argues
that he couldn't have known that the firearms that he was selling
would be used in the conspiracy as described in the indictment in
Count 1.

Here, the drug trafficking crime specified in the
indictment again was the conspiracy between Smith and Carlyle to
distribute cocaine.

1          Mr. Smith does not contest, of course, that he didn't

2     sell the firearms to the Federal agents.

3          The evidence was overwhelming that he did.

4          Rather Smith argues that there was insufficient evidence

5     presented to establish that Smith sold the firearms to the agents

6     in the manner specified in the indictment.

7          In other words -- well, that's enough said.

8          So, the Government's response is that Smith has defined

9     the conspiracy between him and Carlyle too narrowly, and that Smith

10    transferred the firearms knowing that the undercover Agent Godsave

11    was part of a larger drug trafficking operation that Smith and

12    Carlyle had agreed to assist by providing protection services.

13         And so, according to the Government, the transfer of the

14    firearms was part of Smith and Carlyle's conspiracy.

15         So, I think that the motion has to be granted because it

16    really amounts to an impermissible broadening of the indictment.

17         The case I would cite is United States versus Willabee,

18    27 Fed. 3d 263, Seventh Circuit from 1994.

19         In that case, the Defendant was indicted for using a

20    firearm during and in relation to a drug trafficking crime.  And

21    the crime delineated in the indictment was distribution of cocaine

22    pursuant to 18 USC 924 C.

23         Now, the evidence at the trial in Willabee was only

24    sufficient to convict the Defendant of possessing a firearm during

25    and in relation to possession with the intent to distribute, not

the offense charged specifically in the indictment.

The defendant's conviction represented, according to the 7th Circuit, an impermissible broadening of the indictment in violation of the Grand Jury clause of the Fifth Amendment which limits the available bases for conviction to those contained in the indictment.

Here's -- what the Court said is quote, "A resulting conviction cannot stand because there is no assurance that it matches the offense charged. It is in other words reversible per se," end quote.

Even where the Government did not have to include a particular drug trafficking offense in the 924 C charge, where it did so, it narrowed the scope of the charge, and the structure of the indictment, of course, is completely within the control of the Government.

So, the conviction in Willabee could not stand where the evidence at trial, while proving that the Defendant committed a crime, but not the one in the indictment because again the Court said quote, "A conviction that rests, no matter how comfortably on proof of another offense, cannot stand," end quote.

See, for example, also United States versus Ramirez, 182 Fed. 3d 544. It's a Seventh Circuit case from 1999.

I think Willabee is directly applicable here.

The Government has, you know, obviously complete control over the indictment.

1    They are the master of the indictment.

2    And they charged in Count 6 that the Defendant knowing

3    that the firearms would be used in a drug trafficking crime, that

4    is the conspiracy to possess with the intent to distribute, and

5    distribute five kilograms or more of cocaine as described in Count

6    1 of the indictment.

7    The evidence at trial was that Mr. Smith transferred

8    firearms knowing or believing that they would be used in a drug

9    trafficking crime, ie that they were going to some Mexican cartel

10   drug dealers.

11   However, there was really no evidence in the record to

12   support Mr. Smith's conviction for transferring firearms knowing

13   that they would be used in the conspiracy that he had -- he was in

14   with Mr. Carlyle to distribute cocaine as described in Count 1 of

15   the indictment.

16   The evidence presented at trial was that Mr. Smith

17   discussed the sale of the guns with Special Agent Gomez, and

18   Special Agent Godsave only, and there is no evidence, I believe,

19   that he discussed the sale of these firearms with Carlyle at all.

20   So, Mr. Smith repeatedly discussed with Godsave and Gomez

21   that the firearms he intended to sell to Gomez was going to Mexico

22   to be used, as I mentioned, by this drug cartel, but there was no

23   indication based on any of the evidence that Gomez planned to use

24   the weapons as part of his operations in Indiana and Illinois, the

25   operation for which Smith and Carlyle had provided -- agreed to

1  provide protection for.

2       I do think that it's -- the motion for judgment of

3  acquittal must be granted because allowing the conviction to stand

4  would represent an impermissible broadening of the indictment in

5  violation of the Fifth Amendment.

6       So, I'm going to grant the motion for judgment of

7  acquittal on Count 6 on those grounds.

8       All right.  There is also an issue of forfeiture that you

9  wanted to raise with the Court.

10       Mr. Bell.

11       MR. BELL:  Your Honor, the indictment forfeiture

12  allegation contains, I think, four specific items.

13       We have reduced that down to one.  I would ask that the

14  Court incorporate the trial testimony, and then I have just a brief

15  witness to call.  It will take two or three minutes.

16       THE COURT:  Sure.  You may proceed.

17       MR. BELL:  Your Honor, David McDaniel we will call --

18       THE COURT:  Sir, do you want to come forward.

19       Raise your right hand and take an oath.

20

21

22

23

24

25

1

2              DAVID MCDANIEL

3    called as a witness by the  Government , being first duly sworn to

4    testify the truth, the whole truth, and nothing but the truth, was

5    examined and testified as follows:

6              The COURT: You may be seated?

7              DIRECT EXAMINATION BY:

8              MR. BELL:

9    Q    Please state your name.

10   A    David McDaniel .

11   Q    Where are you  employed ?

12   A    I'm a detective  with the  Indianapolis  Metropolitan  Police

13   Department .  I am assigned  to the Bureau Of Alcohol , Tobacco

14   Firearms and Explosives  as a Task Force officer  in the Indianapolis

15   office.

16   Q    Were you  one of the  officers  or agents  assigned  to the John

17   Smith investigation ?

18   A    Yes, I was.

19   Q    And did you  periodically  conduct  surveillance ?

20   A    Yes, I did.

21   Q    And directing your attention to  before January of 2011, did

22   you ever see the Defendant  driving  a 2005 Ford Expedition ?

23   A    Yes, on two separate  occasions  in November  of 2010.

24   Q    Tell us about  those events?

25   A    During the first event I was just conducting  surveillance  at

1   an apartment complex that John Smith had security at.

2       And I observed him and other employees of his company

3   there at that location. I also observed John Smith and in the same

4   black Ford Expedition.

5   Q    Specifically on January 21, 2011 that was one of the days that

6   there was as trip between Indianapolis, Merrillville and

7   Indianapolis, correct?

8   A    Correct.

9   Q    Tell us whether you saw John Smith and the 2005 Ford

10   Expedition?

11   A    Yes. John Smith was in the 2005 Ford Expedition on that date.

12   Q    Did you see him or did other agents see him basically come to

13   a place in Indianapolis before the trip between the undercover

14   Agent Smith and Carlyle?

15   A    That is correct.

16       Other agents did observe that.

17   Q    Okay. Tell us what happened?

18   A    The undercover officer met with Smith at a predetermined

19   location in Indianapolis. And upon arriving at the location, the

20   undercover agent observed Smith remove a firearm from his Ford

21   Expedition and place it in the undercover vehicle.

22   Q    Do you recall what type of firearms were observed?

23   A    Rifles, I believe because there was also other firearms that

24   were in possession of Terry Carlyle, and a handgun.

25   Q    Did Carlyle also get out of the same 2005 Ford Expedition?

1   A      On the second occasion -- he did, or second trip, yes.

2   Q      Not the first trip?

3   A      Correct.

4   Q      Do you recall the trial testimony. I believe you were in

5   Court most of the time?

6   A      Yes.

7   Q      And there were a number of weapons admitted into evidence,

8   correct?

9   A      Correct.

10  Q      Were some of the weapons that were admitted into evidence

11  similar or identical to the ones that he removed from the 2005 Ford

12  Expedition?

13  A      Yes. We recovered weapons that matched the description of the

14  weapons in both trips.

15  Q      All right. And if I recall right, there were some type of

16  small rifles?

17  A      Correct. There were some SKS type rifles that are almost

18  reduced down to the size of a handgun.

19  Q      Okay. After the trip was completed between Merrillville and

20  Indianapolis, did John Smith then get back into the 2005 Ford

21  Expedition?

22  A      Yes. On both occasions.

23  Q      Let's just go back to February 16, 2011. That was the date of

24  the second trip?

25  A      Correct.

1    Q    And did Mr. Smith arrive in the 2005 Ford Expedition?

2    A    He was already at the location prior to the arrival of the

3    undercover officer, but yes, he and both Carlyle were inside that

4    vehicle at that time.

5    Q    They were sitting in it, correct?

6    A    Correct.

7    Q    Did officers or agents observe them take guns from the 2005

8    Ford Expedition and place them in the undercover vehicle?

9    A    Yes.  Both of the defendants were observed removing firearms

10   from the black Expedition and placing them into the undercover

11   vehicle.

12   Q    After the trip, did he return back into the 2005 Ford

13   Expedition?

14   A    That is correct.

15   Q    Now, you've seen the actual forfeiture allegation contained in

16   the indictment, correct?

17   A    Correct.

18   Q    And there is a VIN number that's listed in the forfeiture

19   allegation?

20   A    Correct.

21   Q    Did you compare that number to reports that you have on the --

22   the 2005 Ford Expedition?

23   A    Yes, I did, and they match.

24   Q    Is the VIN number accurate?

25   A    Yes, it is.

1   MR. BELL:  Your Honor, I'll pass the witness.

2   THE COURT:  Mr. Maksimovich, do you have any questions of

3   this witness?

4   MR. MAKSIMOVICH:  Yes, your Honor,

5   CROSS-EXAMINATION  BY:

6   MR. MAKSIMOVICH:

7   Q   Detective McDaniel, on January 21, 2011, when did you first

8   observe the 2005 black Expedition?

9   A   It was actually observed at first by surveilling units, the

10  undercover officer during the meet between the undercover officer

11  and John Smith.

12  Q   Okay.  When did you first observe it?

13  A   I didn't observe it at that point in time.

14  Q   You didn't observe it?

15  A   I was at a separate location.

16  Q   So then on January 21, 2011, you didn't observe the black

17  Expedition?

18  A   That is correct.

19  Q   So, then you didn't observe Mr. Smith get in or out of

20  Expedition?

21  A   That is correct.

22  Q   And you didn't observe Mr. Smith put a gun in or take a gun

23  out of the black Expedition?

24  A   No, I did not.

25  Q   Do you know where that black Expedition is today?

1  A   Yes, it's been seized by the Government. It's in possession

2  of the United States Marshals office.

3  Q   Federal Government?

4  A   Correct.

5  Q   Okay. Were there any other vehicles of Mr. Smith that were

6  seized?

7  A   Yes, there were.

8  Q   By the federal Government or the state government?

9  A   State.

10  Q   Okay. And pursuant to what order?

11  A   State charges.

12  Q   And where are those vehicles today?

13  A   I'm sorry.

14  Q   Where are those vehicles today?

15  A   They are in custody of the Indianapolis Metropolitan Police

16  Department.

17  Q   Okay. Now on February 16, 2011, where were you when you first

18  saw the black Expedition?

19  A   I didn't see it at that time.

20  Q   So, you didn't see Mr. Smith either?

21  A   Not at that time. No.

22  Q   And you didn't see him take a gun out of the vehicle or put a

23  gun into another vehicle?

24  A   No, I did not.

25      MR. MAKSIMOVICH: Nothing further.

1      THE COURT:  Any follow-up, Mr. Bell?

2      MR. BELL:  I don't have any follow-up with this witness.

3      THE COURT:  All right. Sir, thank you.  You may step down.

4   You going to call any additional witnesses?

5      MR. BELL:  Your Honor, I have Agent Godsave who is the

6   undercover agent.  I would proffer that he and other agents saw the

7   Defendant arrive in the 2005 Ford Expedition on both occasions and

8   that weapons were removed.

9      If you'd like I'll call him as a witness.

10     THE COURT:  I think you probably should call him to make

11  the record and allow Mr. Maksimovich to cross-examine him, okay.

12     Then we will call Jeremy Godsave.

13     THE COURT: Good morning, sir.  If you'd raise your right

14  hand take an oath.

15

16

17

18

19

20

21

22

23

24

25

1                   JEREMY GODSAVE

2    called as a witness by the  Government, being first duly sworn to

3    testify the truth, the whole truth, and nothing but the truth, was

4    examined and testified as follows:

5                   DIRECT EXAMINATION BY:

6                   MR. BELL:

7    Q    Please state your name.

8    A    It's Jeremy Godsave.

9    Q    I believe you testified at the trial  and you are the

10   undercover agent from the case, correct?

11   A    That's correct.

12   Q    And directing your attention to  January 21, 2011, were you  the

13   undercover agent on that date?

14   A    Yes, I was.

15   Q    Was there going to be a meeting between you and John Smith?

16   A    Yes.

17   Q    And were you at the location on January 21, 2011 where you

18   were going to meet?

19   A    Yes.

20   Q    Were you  there before he arrived?

21   A    Yes.

22   Q    And did you and other agents observe him arrive in a 2005 Ford

23   Expedition?

24   A    Yes, I did.

25   Q    Did he remove weapons from that car and place them in  your

1  undercover vehicle?

2  A    Yes, he did.

3  Q    And directing your attention to  February 16, 2011, did

4  essentially the same thing happen?

5  A    Yes.

6  Q    Were you at the location before or after he arrived on that

7  day?

8  A    After.

9  Q    Did you see him inside the 2005 Ford Expedition?

10 A    Yes, I did.

11 Q    And did he remove weapons and place those weapons in your

12 undercover vehicle?

13 A    Yes.

14        MR. BELL: Your Honor, I'll pass the witness.

15        THE COURT:  Do you have any questions, Mr. Maksimovich?

16        MR. MAKSIMOVICH:  One second, your Honor.

17        THE COURT:  Sure.

18        (Conference between counsel and client, not within

19 hearing)

20        MR. MAKSIMOVICH:  I have no questions, your Honor.

21        THE COURT:  All right.  Sir, thank you.

22        You may step down.

23        THE COURT: Anything else, Mr. Bell?

24        MR. BELL: No, Your Honor.

25        THE COURT:  Are you going to want to present any

1  evidence, Mr. Maksimovich?

2          MR. MAKSIMOVICH: No, your Honor.

3          THE COURT: All right. Any comments you wish to make as

4  it relates to the forfeiture issue?

5          MR. BELL: No. I believe we have established that the

6  2005 Ford Expedition with the VIN number listed in the indictment

7  was used to facilitate the offenses, and that would -- that's all I

8  have to offer.

9          THE COURT: Mr. Maksimovich, do you want to be heard at

10 all on that?

11         MR. MAKSIMOVICH: I believe Mr. Bell is accurate --

12         THE COURT: I --

13         MR. MAKSIMOVICH: -- in his statement.

14         THE COURT: I do too.

15         I'm going to order a preliminary order of forfeiture.

16         I'll note in the future I would -- I would like it if the

17 Government could provide these sooner. I frankly forgot about the

18 forfeiture until 4:00 yesterday afternoon.

19         MR. BELL: That's all my fault, your Honor.

20         THE COURT: And so, in any event, I am going to order a

21 preliminary order of forfeiture.

22         I do find that the 2005 Ford Expedition VIN number,

23 1FMPU16575LB01923 was used by the Defendant in a manner to help

24 facilitate the commission of the -- four of the offenses of

25 conviction, and therefore I'm going to enter a preliminary order of

forfeiture this morning. And at the sentencing hearing we'll also discuss the forfeiture, and I will finalize that determination at least as it relates to Mr. Smith's interest in that -- in that property.

All right. Anything else that we need to talk about as it relates it to forfeiture or any other issues before we get into the sentencing itself?

MR. BELL: No, Your Honor.

THE COURT: Mr. Bell.

Mr. Maksimovich.

MR. MAKSIMOVICH: No, your Honor.

THE COURT: All right.

So, we are still on the record in 2:11 CR 53, United States versus Smith. We're here, as I mentioned earlier, for the sentencing of the Defendant.

He's present with his lawyer. Gary Bell, Dave Nozick are here for the Government.

Mr. Smith was convicted by a jury of Counts 1 through 6. I have since granted a judgment of acquital on Count 6, so he now stands convicted of Counts one through five.

The jury returned a verdict on June the 6th of 2013. I ordered the preparation of a presentence report.

And I received the revised copy of the report on September the 3rd. I have studied the report and the addendum.

I also received a sentencing memorandum from the

1   Defendant which have studied prior to the hearing today.

2          Mr. Maksimovich, did both you and your client receive a

3   copy of the presentence report and the addendum some time before

4   the hearing today?

5          MR. MAKSIMOVICH: Yes, your Honor.

6          THE COURT: Mr. Smith, is it true that -- did you have a

7   chance to go over the presentence report and to study it with your

8   lawyer?

9          THE DEFENDANT: Yes.

10         THE COURT: All right. '

11         Mr. Bell, I assume the Government also received the

12   report some time before the hearing today?

13         MR. BELL: Mr. Nozick.

14         THE COURT: I'm sorry. Mr. Nozick.

15         MR. NOZICK: Yes, your Honor.

16         THE COURT: All right. The presentence report and the

17   addendum are placed in the record under seal.

18         It's directed that if an appeal is taken, counsel on

19   appeal shall be permitted access to the sealed report.

20         It's further directed that counsel on appeal are not

21   permitted access to the recommendation section of that report.

22         In looking at the addendum to the presentence report,

23   there is one objection that has been raised by counsel that I need

24   to resolve.

25         Does the addendum accurately identify what's in dispute,

1    Mr. Maksimovich?

2              MR. MAKSIMOVICH:  Yes, it does, your Honor.

3              THE COURT:  Mr. Nozick.

4              MR. NOZICK: It does.

5              THE COURT:  All right.  Would both of you agree that the

6    factual statements contained in the presentence report other than

7    what's identified in the addendum as being in dispute, is

8    everything else accurate?

9              Mr. Nozick.

10             MR. NOZICK: Yes.

11             THE COURT:  Mr. Maksimovich?

12             MR. MAKSIMOVICH:  Yes, it is.

13             THE COURT:  All right.

14             So, I do -- I will hear any argument or any evidence you

15   wish to present on the one guideline issue that I need to -- I need

16   to resolve, and that is whether the Defendant obstructed justice

17   such that a two level enhancement in his guideline range is

18   applicable.  Because that's an upward movement in the guidelines,

19   the burden is on the Government.

20             So, Mr. Nozick, anything you wish to say as it relates to

21   that objection or any evidence you wish to present?

22             MR. NOZICK: Yes.  No evidence I wish to present.

23             I will rely on the trial, which this honorable Court sat

24   through.

25             It's always a tricky one when the Defendant testifies, is

1  convicted and then he gets the enhancement.

2      Obviously, they have a right to testify.  They have a

3  right to put forward their own version of facts and mount a

4  defense.  And to some extent defense has a valid argument when they

5  say just because they are convicted, doesn't mean they perjured

6  themselves.

7      However, in this case, it's not sort of a he said,  she

8  said, and Roberson said that he didn't do this.

9      His testimony is -- clearly makes no sense on its own

10  face. The defendant's defense was that he was entrapped, that John

11  Roberson was telling him, "I'm in debt to this drug trafficking

12  group, they are going to kill me, you have to help me out."

13      Well, when we heard the tapes not only was there no

14  mention of any of that, but when the Defendant is talking to

15  Special Agent Godsave, during some of these meets they are talking

16  about, I don't want  to cut out John Roberson.

17      Are you going to break him off some of the  proceeds out

18  of your profit.

19      The Defendant asks, or should I pay him out of my profit.

20      Now, if this was all about saving Roberson from a drug

21  debt that he had, why would Godsave, part of the same drug

22  trafficking organization, possibl y be talking about , hey let's not

23  cut him out.  Which one of is us going to pay Roberson out of our

24  proceeds.  The defendant's theory of the defense made no sense

25  whatsoever.

1        And there was zero evidence about it during any -- during
2   any of the trial.  There was recording after recording after
3   recording.  There is simply no evidence of it.  And the evidence we
4   heard ran contrary, ran completely against what the Defendant was
5   saying.
6        Furthermore, I know he's going to say that he was
7   attacked in Kankakee.
8        You know, the Government's belief is that it was the
9   opposite, but regardless of what happened in Kankakee, we had
10  testimony, not at trial but in this Court, before Mr. Carlyle
11  testified that he was being threatened there in lockup by the
12  Defendant.
13        The Defendant was threatening what would happen to him if
14  he testified.
15        Judge, I believe all of that easily amounts to a two
16  point enhancement for obstruction.
17        THE COURT:  Mr. Maksimovich, any evidence you wish to
18  present or just proceed by way of argument, or anything from you,
19  sir?
20        MR. MAKSIMOVICH:  I have an incident report from the
21  Kankakee County Jail that I probably would like to mark and
22  introduce.
23        THE COURT:  Sure.
24        MR. MAKSIMOVICH:  Your Honor, first if I may stand I feel
25  better.

1        First, I'd like to address the allegation that Mr. Smith

2   lied and perjured himself at trial when he told the jury that Mr.

3   Carlyle instigated the incident that he was involved in with Mr.

4   Carlyle at the jail, and that he did not attack Mr. Carlyle, but it

5   was the other way around.

6        And I have an incident report from the Kankakee County

7   Sheriff's office which I would like to introduce as Defendant's

8   Exhibit A, if I may approach.

9             THE COURT:   Sure.

10            MR. NOZICK: No objection

11            (Whereupon, evidence previously marked

12            Defendant's Exhibit A

13            Were admitted in evidence.)

14            THE COURT: Defendant's Exhibit A will be admitted.

15            MR. MAKSIMOVICH:  And in Defendant's Exhibit A, which is

16  the incident report from the Kankakee County jail, the

17  investigating officer asked other inmates, the witness, this

18  occurrence, what happened.

19            And the other inmate said Mr. Carlyle, you know, was

20  kicking at Mr. Smith.

21            Mr. Smith grabbed his leg and he fell.

22            It was a dispute over a TV, as silly as that sounds.  Had

23  nothing to do with Mr. Smith retaliating for Mr. Carlyle's

24  anticipated testimony at the trial.

25            Can I go on --

1          THE COURT:   Sure.   Sure.

2          MR. MAKSIMOVICH:   Okay. Fine.

3          THE COURT:   I wasn't --

4          MR. MAKSIMOVICH:   As far as that incident, my

5    understanding really of what occurred there was more out of

6    frustrations that have to do with housing than anything else.

7          You know, both of them had been kept in a cell together

8    for some time.

9          The lights never went off in the cell, and they were

10   always on.  It was difficult to sleep.  One TV, at least a few

11   people in the cell.

12         Lots of frustrations as to who was going to get to watch

13   the TV, how it was going to be used, silly things we take for

14   granted became very important to these confined inmates and a

15   dispute erupted.

16         And basically what we have here are two different

17   versions of what occurred and didn't occur.  And quite honestly,

18   none of us were there, and probably don't really know what

19   happened, but I'm believing Mr. Smith.

20         As far as the trial testimony, we all know, not to be

21   simplistic here, but the mere fact that Mr. Smith testified and got

22   convicted, does not mean that when he testified he was telling

23   lies.

24         And as far as you know, what occurred and didn't occur

25   between Mr. Roberson and Mr. Smith, as far as I'm concerned, really

1  is anybody's guess.

2      I will point out that the Government's discovery, the

3  reports that were provided, indicated that Mr. Roberson at times

4  was wired, you know, wearing recording devices. And we -- no

5  conversations occurred between Mr. Roberson and Mr. Smith or Mr.

6  Roberson or anybody else were -- were introduced here other than --

7  and obviously, the government had plenty of recordings and tapes,

8  introduced lots and lots of video and audio recordings, but there

9  was no recordings between Mr. Roberson and Mr.

10 Smith that were introduced at the trial although the reports still

11 indicate he was wired.

12     So, what -- what was going on between Mr. Roberson and

13 Mr. Smith, I certainly don't have any firsthand knowledge.

14     I know what -- what my client tells me and what my

15 experiences in life just are. And sometimes some -- you know, it's

16 not quite the way it appears when you first look at it.

17     I just don't feel that there was enough there to

18 definitively say that Mr. Smith was not being truthful when he

19 testified.

20     And I would ask the Court to grant that objection and not

21 count those two levels for obstruction of justice. And I believe I

22 also would point -- flippant argument, but I would point out to the

23 Court, I don't think it's going to make a difference in the

24 sentence whether the Court grants or denies it.

25     THE COURT: I don't think so either.

MR. MAKSIMOVICH: But just the point, it just gets sometimes into an unfortunate situation when -- sometimes in some situations it seems like every time the Defendant gets up and testifies and looses, he's adjudicated a liar.

And I don't believe in this case that the evidence is that strong.

Thank you.

THE COURT: All right. Thank you.

Anything else, Mr. Nozick.

MR. NOZICK: Just briefly. First of all, I concur that it probably will not have an effect on the sentence.

Obviously, I can't predict what the honorable Court will do but I don't think it will have an effect on the sentence. I was going to mention that, but I think post Booker you still have to get the guidelines accurately.

But I don't want to sort of put too much effort into this point.

The only things I would counter are, one, it's not just that his testimony runs contradictory to all of the tapes. It also runs contradictory to his own witness.

He chose to call Carlyle, and Carlyle said, you never told me this was about that. He said this was just about money. He would do anything to get money. He never mentioned any pressure on Roberson. And after we got arrested, he even started talking to me about, here is the defense we need to mount.

1          Here is what we should start saying.

2          So, I understand the defense's argument.  Maybe  the

3    court's concerns, you don't want a two point enhancement for

4    obstruction type of  chilling effect on the defendant's decision

5    whether or not  to testify, however I strongly believe  that he made

6    his defense up out of whole cloth.

7          The jury believed the same thing, and it ran contrary not

8    just to all the tapes but to his own witness that he called.

9          THE COURT:  All right.  I'm going to overrule  the

10   objection.

11         I do believe  that a two point enhancement  is appropriate

12   in this case on two bases.

13         First the incident in the jail -- I mean, I sat here  and

14   watched Mr. Carlyle testify.  And I'm not sure I've ever seen  a

15   witness as scared as he was in this courtroom.

16         You had to be in this courtroom to fully appreciate how

17   intimidated he appeared to be.  I do not believe for a minute  that

18   the fight at the jail was over a television set.

19         It is true that that's what the report says, Defendant's

20   Exhibit A, but what it says is that Mr. Smith's stated that  the

21   trouble had started over the television.  And Mr. Carlyle testified

22   to the contrary, said it was really -- it was a flat out episode of

23   attempting to  intimidate him, knowing that Mr. Carlyle -- Mr.

24   Carlyle was pleading guilty.

25         And it does say in the report  that the witnesses said

that Mr. Smith was the aggressor. Not the other way around. And so, I am entirely convinced, certainly by a preponderance of the evidence that that was an effort to obstruct justice.

I also agree that Mr. Smith's perjured himself at the trial.

He testified that this whole thing had to do with trying to work off a drug debt that Mr. Roberson owed, but this was contradicted by Roberson's testimony, and also by the fact that during a recorded conversation between the Agent Godsave, and the Defendant, they discussed which of them was going to compensate Roberson, so that Roberson would not feel like he was being cut out of the proceeds, which is just at odds with -- with the defense theory of the case.

So, I do believe that the two point enhancement for obstruction is clearly applicable in this case.

So, let me make my guideline determinations as follows.

There is a total offense level in this case of 36.

That's derived at as follows. There is an initial offense level of 34. That's pursuant to 2 D 1.1 C 3.

Two points were added by virtue of the decision I just made. The Defendant did willfully obstruct justice under 3 C 1.1.

And that's -- there's -- so that's a total offense level of 36.

The criminal history category is one. That leads to a range of suggested incarceration under the guidelines for Counts 1,

1    2 and 4 of 188 months to 235 months.

2           On Count 3 there is a five year mandatory consecutive

3    term of imprisonment.

4           And on Count 5, there is a mandatory consecutive term of

5    25 years.

6           Supervised release range is one to five years.

7           On -- I'm sorry, two to five years on Counts 1 to 5.

8           The fine range is from 20,000 to 3 million -- $30

9    million.

10           Restitution is inapplicable, and there is a $500 special

11    assessment.

12           Based on the rulings I just made, is that all accurate,

13    Mr. Maksimovich?

14           MR. MAKSIMOVICH:  Yes, Your Honor.

15           THE COURT:   Mr. Nozick.

16           MR. NOZICK:  Yes, Your Honor.

17           THE COURT:  All right.   Mr. Maksimovich, as the lawyer for

18    the Defendant, is there anything that you wish to say on his behalf

19    before I sentence him?

20           MR. MAKSIMOVICH:  Yes, Your Honor.

21           Your Honor, the most remarkable thing basically that I

22    can say about Mr. Smith, he has zero criminal history points.

23           No convictions whatsoever.  He's ironically in his life,

24    he has virtually no -- he has no connection to drugs. He doesn't

25    use drugs. He doesn't drink. He doesn't smoke.

He -- he wouldn't know what to do with a pile of cocaine if he had it. He really wouldn't.

One way or another, he -- he got hoodwinked into doing what he did.

And in every sense of the word, he got taken for a ride. I mean, the ATF put him in the car, Indianapolis; drove hem up here to Lake County. Drove him back to Indianapolis. Total of 25 kilos of imaginary pancake mix. He never got out of the car.

And now, the way I look at his sentencing predicament, 40 years is the absolute least the Court can give him.

And it -- it's astonishing. It is truly astonishing.

I put together a little sentencing memorandum and filed it. I don't want to be redundant, but I would ask the Court to make the counts that can be concurrent, and sentence Mr. Smith to a total of 40 years.

I -- I believe that's the least the Court can sentence him to. I believe he's 44, 45 years old right now. Never had a problem with the law before this.

I don't see how he's going to be a threat to anybody in the future. 40 years certainly would seem to promote all the interest of justice that are quoted in Section 3553. And that's what I would ask the Court to do.

THE COURT: All right. Thank you, Mr. Maksimovich.

Mr. Smith, do you wish to make a statement in your own behalf or present any other information to me, sir?

1        THE DEFENDANT: Yes, your Honor.

2        THE COURT:  You may.

3        THE DEFENDANT:  Your Honor, I'd like to thank you for

4   this opportunity to address the Court.  I've been incarcerated for

5   almost three years waiting for this moment.

6        Sir, at the time of my arrest I was living the American

7   dream.  I had co-founded a detective agency in 1997 and then

8   separated from that company in 2000 at which time I created Elite

9   Services as a sole proprietorship.

10       I was about to marry the most beautiful woman in the

11  world, and other than the constant harassment from the Indianapolis

12  Metropolitan Police Department, my live was perfect.

13       Sir, I was raised by my grandparents with old morals and

14  standards.  My grandfather instilled in me that a man is only as

15  good as his word and his reputation.

16       And it was this principle -- these principles that aided

17  me into building Elite Services with no website or advertising into

18  a million dollar a year company.

19       I had also started several other small businesses in

20  conjunction with Elite Services.  And the entire enterprise was

21  grossing approximately $1.2 million a year at the time of my

22  arrest.

23       Sir, I believe it is important to point out that prior to

24  my arrest, I had been living for free for the last two years.  I

25  was head of security for Capital Place (phonetic) Apartments and

was receiving a three bedroom, two bath townhouse in exchange for my services. As the PSI indicated, I was not at all suffering from financial problems. I did not need the money and certainly none of this was ever about money.

Before my arrest, I was also current on all my child support of three children.

Darrian, my daughter who is 12 and Braxton my son, my youngest son who is 5, and Spencer my oldest who is 23, and the proud father of my two grandsons, (unintelligible)

I was such a big part of their lives and, your Honor, they desperately need the love, security and stability that I brought into their lives.

While I've been incarcerated I was contacted by CPS regarding two separate complaints of neglect filed against Nicole, my ex-wife and the mother of my two youngest children.

The complaint was filed by one of her many boyfriends, family members. And this is exactly why they need me in their lives.

Sir, at this time I do humbly apologize for my actions and my behaviour, and the persona that was adapted during this period of time.

However, it is important to realize that if the Federal Government and the Indianapolis Metropolitan Police Department and their agents had not created and controlled the entire situation, I would not be standing before you today.

1    Sir, I've never used illegal drugs of any kind. I don't
2 associate with or even know  drug dealers.

3    I would not know what -- where to purchase drugs or how
4 much they would cost or what to do with them once I had them.

5    Sir, I'm far from perfect, but my integrity as a law
6 enforcement officer should never be questioned. Please let the
7 Court be reminded that I freely testified about police and
8 political corruption in Indianapolis, Indiana in May of 2008.

9    Because right is right and wrong is wrong, no matter who
10 you are, no one is above the law. That is what this is all about.

11    Sir, I stand before you today with no doubt in my mind,
12 that's through the investigation, indictments, the terminations and
13 suspensions of police officers and politicians that derived from my
14 testimony that's what's caused me to become a target.

15    This is why this entire crime was created and controlled
16 by the federal  Government.

17    Your honor, please let me reiterate this was never about
18 money. If it were, I would have not given Special Agent Godsave a
19 $750 handgun as a gift or put approximately $75 worth of fuel in
20 his undercover vehicle with my credit card.

21    I was not predisposed to participate in any of this, but
22 due to an enormous amount of inducement, persuasion and coercion,
23 Your Honor, I felt I had no other choice.

24    As we speak, I'm in the process of working with an
25 investigative reporter, and I feel it's important  that the public

know how and why this all transpired.

Sir, today, the justice system has failed me. It has allowed the Indianapolis Metropolitan Police Department and Federal Government to spend hundreds of thousands of dollars of taxpayers' money to create and control an entire crime and then induce someone who's not predisposed or have any type of propensity to become involved in such a dangerous situation to become involved.

And then spend hundreds of thousands of dollars more to try to -- to try, convict and then imprison them for rest of my life.

Where is the justice in that, I ask you?

Finally, Your Honor, I respect your authority, and I will respect your ruling, however, I did not attempt to possess or conspire to possess and distribute cocaine and neither did Mr. Carlyle.

And I will continue to fight to clear my name and my reputation.

Thank you.

THE COURT: All right. Thank you, sir. Mr. Nozick, does the Government have any comments or recommendations as to the sentence I should impose?

MR. NOZICK: Yes, Your Honor.

Just briefly since the Defense counsel and I are asking for the same sentence, Mr. Maksimovich has said that a sentence no greater than the 40 year minimum mandatory is necessary. I concur.

The guidelines calculated today are above that.

I don't think any one in this Court thinks that he needs more than 40 years on this crime.  To be candid there is probably no difference between a 40 and 45 year sentence for him at the age that he is at.

He -- I disagree strongly with the number of things that he said today. He repeatedly said this wasn't about money, but you heard him on the tape over and over, probably played 15 times where he said it was all about money and that he would do anything for money.

Mr. Maksimovich and the defense and the Defendant has said that he lived a law abiding life.  That is not correct. He has no felony convictions, but he does have a pending arson and insurance fraud case.

Bear in mind also that he came to our attention because as an ex-police officer he was using his badge and gun to pull over illegal immigrants and shake them down and take their cars.  So, we didn't choose him out of nowhere.  We chose him because of complaints that he was abusing his badge.

He says over and over again, and defense says he had nothing to do with drugs.  He didn't want anything to do with drugs and wouldn't know what to do with them.

We don't put him up here as a big drug trafficker.  We put him up here and tried him as a man with a badge and a gun who was ready to abuse his badge and gun, to do virtually anything. And

we believe he would do virtually anything to profit by abusing his badge and his gun. We are not saying he is a big drug trafficker. We are saying he is a thug with a gun.

And he happens to have a badge because some police department made the mistake of hiring him, and he still had his badge.

He says that he had no predisposition towards crime. Defense counsel says that this is all a big set up because of some beef with him.

If the Court recalls, we called an Indianapolis Metro police officer named Jeremy Ingram, who testified that on the night that Special Agent Godsave and the Defendant were out sort of for a social night, there are some concerns that Smith had about -- about Special Agent Godsave.

They went out to strip clubs one night. At some point in time Jeremy Ingram comes by, kind of looks like rough looking guy, looks like a drug dealer.

Special Agent Godsave gets up and leaves to go to the bathroom.

And on his own within a minute or so the Defendant approaches Ingram, says, do you need anything done? I'll run dope all around town for you. Just pay me. I've got a badge. I've got a gun. I will run dope anywhere you want.

He did that on his own without being asked.

So, this all sort of being a setup to lure in some

unsuspected guy just isn't the case, Your Honor.

As I've said before at previous sentencings, he was -- they were both ready to kill the -- anyone in this case. The Defendant was saying that if he found out -- he told Roberson that if he found out that Godsave was an agent, he was going to kill him.

He also said numerous times on the tape, we'll kill those Mexican drug traffickers if we have to. Just take off your hat, and we will shoot and kill those guys. I'm going to shoot the one on the right. Carlyle will shoot the one on the left.

Maybe the Court can disagree and maybe you said previously you thought it was bluster.

I don't think it was bluster, judge. He had a badge and a gun and he was ready to kill anyone who got in his way.

I believe that 40 years is a just sentence in this case, and I am asking the Court to give that sentence.

THE COURT: All right. The Supreme Court modified the Federal Sentencing Act and made the guidelines advisory about seven or eight years ago.

Under the Booker case, the guidelines, of course, used to be mandatory. They are now advisory.

What that means is that I have to consult the guidelines to get advise as to what a reasonable sentence might be.

But I'm also required to take into account a whole range of other factors in arriving at the sentence that I give.

1    In other words, I can't arrive at a sentence with a thumb
2    on the scale in favor of a guideline sentence.

3    I have to treat the guidelines as one factor neither more
4    important nor less important than all of the other factors.

5    So, in addition to the guidelines, I look at the nature
6    and circumstances of the offense, and the history and
7    characteristics of the Defendant.

8    I need to impose a sentence that promotes respect for the
9    law, reflects the seriousness of the offense, provides just
10   punishment. I have to be concerned with deterring criminal
11   activity, both specific deterrence and general deterrence.

12   The former being deterring this individual from
13   committing additional crimes, and the latter concept being sending
14   a message to the community about not -- the criminal justice system
15   not putting up with certain types of behaviour.

16   That's the concept of general deterrence.

17   And I have to avoid unwarranted sentencing disparity
18   among similarly situated defendants, and ultimately the goal is to
19   arrive at a sentence that's sufficient but not greater than
20   necessary to achieve the statutory goals of sentencing.

21   I'm going to go along with the parties' essentially
22   stipulated sentence of 120 months on Counts 1, 2 and 4. That's the
23   mandatory minimum.

24   I'm going below the guideline range on those three counts
25   given fact that the Defendant is a first time offender. And under

the circumstances of this case where essentially it's the
Government who is choosing the amount of the narcotics involved in
the offense, I think in all fairness, 120 months for that conduct
is more than sufficient to achieve the goals of sentencing, and
reflect the seriousness of the offense.

And so -- and I also believe that if someone were to hear
that sentence, it would certainly serve as a deterrent to other
would-be drug protectors as it were, that they would be deterred by
a 120 month sentence.

So, I believe that that's the amount that's sufficient
but not greater than necessary to achieve the statutory goals of
sentencing as it relates to Counts 1, 2 and 4.

Of course, I'm required to then give a consecutive
sentence on Count 3 of 60 months, and then an additional
consecutive sentence on Count 5 of 300 months, for a total term of
imprisonment of 420 (sic) months.

That's 40 years.

You know, that is -- it's a decision that's up to
Congress. I -- I would be remiss if I didn't say I think it's a
sentence that's greatly in excess of what would be necessary to
deter people from engaging in certain behavior, but I'm mandated to
give this sentence, and it's the sentence that I will give.

I will also note that I do disagree with Mr. Smith's
comments here in court.

I would be remiss if I didn't say that I frankly cannot

1  reconcile what he said here in open court with what I heard on the

2  undercover recordings.

3       So, I'm not at all being critical of the Government for

4  having brought this case. I think it's a righteous prosecution

5  that was necessary given the defendant's conduct and action. And

6  what I heard on those tapes were -- was very alarming, and so, I

7  can't reconcile what I heard on those tapes with what I'm hearing

8  in open court from the Defendant here today.

9       My quarrel is with the extent of the punishment that the

10  924 C statute mandates. If this is what Congress had in mind, I

11  would be surprised, but that's not for me to decide.

12       All right.

13       Let me formally state the sentence. I'll give counsel

14  one final chance to make any final objections.

15       Pursuant to Title 18 United States Code Section 3551 and

16  3553 as modified by United States versus Booker, it's the judgment

17  of the Court that the Defendant is hereby committed to the custody

18  of the Bureau of Prisons for a term of 120 months on Counts 1, 2

19  and 4, but consecutive to a term of 60 months imprisonment on Count

20  3, and consecutive to a term of 300 months on Count 5 for a total

21  term of imprisonment of 420 months.

22       The Defendant shall -- just want to make sure I'm doing

23  the math right here.

24       I said 420 months. I believe it's 480 months. I

25  apologize. So, for the total term of imprisonment is 480 months.

1       He will then be placed on five years of supervised

2   release.

3       Those will all be concurrent with one another on Counts 1

4   through 5.

5       While the defendant's on supervised release, the

6   Defendant shall comply with the following mandatory conditions.  He

7   shall not commit another Federal, state or local crime. He must

8   report to the probation office in the district in which he is

9   released within 72 hours of release from the custody of the Bureau

10  of Prisons.

11      He shall not unlawfully possess a controlled substance

12  and shall refrain from any unlawful use of a controlled substance.

13      The mandatory drug testing condition is suspended based

14  on my determination that he poses a low risk of any type of

15  substance abuse.  He shall not possess a firearm, ammunition,

16  destructive device or any other dangerous weapon.

17      He shall cooperate in the collection of DNA as directed

18  by the probation office.

19      He shall comply with the 15 standard conditions that have

20  been adopted by this Court and also comply with the following

21  special conditions.

22      The Defendant shall participate in a mental health

23  treatment program and abide by all the program requirements and

24  restrictions.

25      He'll have to pay for the cost of participation in the

1  program but not to exceed his ability to pay for it on a sliding

2  fee scale established by the Department Of Health And Human

3  Services.

4         He's ordered to pay a special assessment of $500 that's

5  due immediately.  That's $100 on each of the five counts to which

6  he has been convicted.  I'm going to impose no fine because the

7  defendant's lack of assets at this point makes it unlikely that he

8  will be able to pay a fine, so I'm going to waive the fine in this

9  case.

10        I'm also ordering that the Defendant hereby forfeit his

11 interest in the 19 -- 2005 Ford Explorer.  I'm sorry, 2005 Ford

12 Expedition, VIN number is 1FMPU16575LB01923 based on the hearing we

13 had earlier.

14        So, his interest in that property is hereby forfeited.

15        The sentence that I have just given is below the advisory

16 guideline range for the reasons  that I've already previously

17 stated.

18        Counsel, do either of you know of any reasons why the

19 sentence should not be imposed as stated?

20        Mr. Maksimovich.

21        MR. MAKSIMOVICH: No, your Honor.

22        THE COURT:   Mr. Nozick.

23        MR. NOZICK: No, your Honor.

24        THE COURT:   All right.  I order the sentence imposed as

25 stated.

1      Mr. Smith, you've heard the judgment of the Court

2  imposing sentence upon you. Pursuant to Rule 32 J of the Federal

3  Rules of Criminal Procedure, I advise you that you can appeal your

4  conviction in this case.

5      You also have a statutory right to appeal your sentence

6  under certain circumstances if you think it was contrary to law.

7      Any notice of appeal must be filed within 14 days of the

8  judgment being entered in your case.

9      And if you want to file an appeal but you can't pay for

10  the costs of an appeal, you may apply for leave to appeal in forma

11  pauperis which means you can pursue at appeal at no cost to you.

12      And Mr. Maksimovich, I just remind you of your duties to

13  perfect the appeal.

14      You remain responsible for his representation on appeal

15  unless you are relieved by the Court of Appeals upon motion.

16      Mr. Maksimovich, do you want me to make a recommendation

17  as to a placement?

18      MR. MAKSIMOVICH: Yes. Yes, Your Honor. Mr. Smith has

19  family in Florida, so, if the Court could make a recommendation to

20  place him somewhere close to Florida.

21      THE COURT: Okay.

22      I will include that in the judgment and commitment order

23  that I recommend that he serve his sentences as near as possible to

24  the State of Florida so that he can have the support of his family.

25      Anything else then, Mr. Maksimovich.

1    MR. MAKSIMOVICH:  Nothing, Your Honor.

2    THE COURT: Mr. Nozick.

3    MR. NOZICK: No, your Honor.

4    Thank you.

5    THE COURT:  All right.  Thank you.

6    (WHICH WERE ALL THE PROCEEDINGS HAD).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                    C E R T I F I C A T E
3
4        I, Sharon Boleck Mroz, being a duly   authorized
5   and acting official court reporter for the
6   United States District Court, for the Northern
7   District of Indiana, Hammond Division, do hereby
8   Certify that I did report in machine shorthand the
9   foregoing proceedings, and that my shorthand notes
10  So taken at said time and place were reduced to
11  typewriting under my personal direction.
12       I further certify that the foregoing typewritten
13  transcript constitutes a true record of said
14  proceedings, so ordered to be transcribed.
15
16            ____S/ Sharon Boleck Mroz_____
17                 Sharon Boleck Mroz
18                 Official Court Reporter
19            Dated:   December 23, 2013
20
21
22
23
24
25
```