CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1119

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOHN SMITH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:11-cr-00053-PPS-APR-1 — **Philip P. Simon**, *Chief Judge*.

ARGUED JANUARY 20, 2015 — DECIDED JULY 7, 2015

Before RIPPLE and ROVNER, *Circuit Judges*, and KENNELLY, *District Judge*.[*]

RIPPLE, *Circuit Judge*. John Smith was arrested after a sting operation in which the Government had organized two fictional drug transactions. Based on his participation in that

---

[*] The Honorable Matthew F. Kennelly of the United States District Court for the Northern District of Illinois, sitting by designation.

2                                                                  No. 14-1119

operation, a jury convicted Mr. Smith of both conspiring and attempting to possess with intent to distribute more than five kilograms of cocaine, transferring firearms with knowledge that they would be used in a drug trafficking crime, and possessing a firearm in furtherance of a drug trafficking crime. Mr. Smith appeals his conviction, arguing that the Government's conduct violated his right to due process of law by coercing him to engage in illegal activity. After careful study of the governing case law and of the record, we conclude that no such coercion took place. The district court, therefore, did not plainly err by failing to dismiss Mr. Smith's indictment. We therefore affirm the judgment of the district court.

# I

# BACKGROUND

## 1.

Prior to his arrest, Mr. Smith was a part-time police officer and the owner of security and towing businesses. In 2009, Detective Shani Anderson began investigating Mr. Smith for employment tax crimes and other offenses.[1] She eventually enlisted Jon Roberson, one of Mr. Smith's employees, as an informant. Mr. Smith had become close friends with Roberson, who previously had been a member

---

[1] Mr. Smith submits that he was targeted by the Indianapolis Metropolitan Police Department for testifying in 2008 regarding police corruption in Marion County and Indianapolis. Detective Anderson testified that she was not aware of that testimony until after she began her investigation.

No. 14-1119 3

of the Latin Kings street gang and had been convicted of selling drugs and of shooting a rival drug dealer. Roberson told Detective Anderson that Mr. Smith had committed insurance fraud and arson and that he had extorted money from undocumented immigrants.

In the fall of 2010, Mr. Smith told Roberson that he needed money. According to Roberson, Mr. Smith knew that drug dealing was taking place at the apartment complexes where he provided security services, and he asked Roberson to find a drug stash house that he could rob while wearing police gear. He also asked if Roberson knew any Latin Kings that needed security protection while transporting drugs. Roberson relayed this information to Detective Anderson, and she referred the case to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

The ATF agent overseeing the investigation continued to use Roberson as a confidential informant. The agent decided to operate in an undercover capacity to determine if Roberson accurately had reported that Mr. Smith was willing to provide security protection for a drug organization. Roberson introduced the agent to Mr. Smith as "Danny," Roberson's longtime friend with ties to New York drug dealers and mobsters. During their first meeting, Danny mentioned that he might need some "security type stuff," to which Mr. Smith replied, "I'll hook you up. …I'm loyal as the day is long. Anything you and I talk about, it's me and you," and, "I'm all about making money."[2] Mr. Smith also suggested that he could help "[c]lean" money

---

[2] Gov't Ex. 8c, at 2.

for Danny.[3] Mr. Smith described how others had asked him to make a drug run using his police car, but he had declined because he wanted to "make several trips" and make more money.[4] Mr. Smith told Danny that he carried assault weapons and that he absolutely would watch Danny's back. Near the end of the meeting, Mr. Smith explained that he would use his badge to get out of trouble if they were pulled over. Danny asked if Mr. Smith knew anyone else who could assist them, and Mr. Smith stated that he knew another police officer who, like him, was "all about money."[5] Before parting ways, Mr. Smith asked Danny to give him a call.

Five days later, Danny came to Mr. Smith's towing business. Danny told Mr. Smith that he did "runs" for people from New York who "aint no joke."[6] Mr. Smith responded, "It's all good," and told Danny that he could "transport or move or whatever…you want to do to whatever. I don't care. …I'll just watch your back."[7] Mr. Smith then asked how much money he would make and suggested that they take his car on any runs because the police would be less suspicious if they ran his plate. He reassured Danny that he was willing to kill. Mr. Smith also told Danny that he was "a big gun nut" and offered to sell

---

[3] *Id.* at 4.

[4] *Id.* at 13.

[5] *Id.* at 19.

[6] Gov't Ex. 8f, pt. 1, at 1.

[7] *Id.*

No. 14-1119 5

him or others an unregistered assault rifle and a pump shotgun.[8]

The next week, Mr. Smith met Danny outside of a Steak 'n Shake restaurant. Danny expressed reluctance to deal with Mr. Smith because of Mr. Smith's past participation with an FBI investigation. Mr. Smith told Danny that he was "an open book," that he was "in this for the…money," and that he was a businessman who "provide[s] protection and that's all."[9] He also reassured Danny that he did not "snitch" to the FBI. During their discussion, Danny told Mr. Smith that he did not have to participate in the transportation of the drugs if he was not up to it. Danny reminded Mr. Smith that driving with a half million dollars' worth of drugs in his car could lead to his being killed or jailed for life. Mr. Smith replied that he did not have a problem with the risks associated with the transaction because he was "just as careful as" Danny.[10] Mr. Smith then asked if he could bring along somebody he trusted because the situation "could get serious and it could [get] messy."[11] Mr. Smith indicated that he would bring his own weapons, including an assault rifle, on any runs, and asked if he should rent a car.

A month later, Mr. Smith met Danny at an Indianapolis gun show where he purchased three firearms for him.

---

[8] Gov't Ex. 8f, pt. 2, at 3.

[9] Gov't Ex. 8i, at 3.

[10] *Id.* at 13.

[11] *Id.*

6                                                                  No. 14-1119

Mr. Smith also introduced Danny to a police-officer acquaintance. Mr. Smith and his acquaintance told Danny that they wanted to "make some money."[12] Danny told them that he had a trip planned in about a week, and Mr. Smith replied that he could "do Thursday or Friday."[13] Mr. Smith offered to drive after his acquaintance expressed concerns about making the run in a rental car. Mr. Smith then asked if they were "picking up or taking to" and whether Danny had "dealt with this guy before."[14] Danny responded that they were going to pick up the drugs and that he had dealt with the drug supplier for a long time.

Danny met Mr. Smith at a Denny's restaurant four days later. Instead of his original acquaintance, Mr. Smith now had recruited Terry Carlyle, a police officer, to assist him in providing security. At the meeting, Mr. Smith acknowledged that the trip was "a protection detail."[15] The three men discussed logistics, and Mr. Smith stated that he would bring two guns with him, including "an AK-47 with a folding stock."[16] Mr. Smith also told Danny that he had "a bunch of handguns" and "two AK-47 pistols" that he was willing to sell to Danny.[17] Mr. Smith stated his desire to develop a long-term relationship in which he regularly

---

[12] Gov't Ex. 8l, pt. 1, at 2.

[13] *Id.* at 6.

[14] *Id.* at 11.

[15] Gov't Ex. 8o, pt. 1, at 1.

[16] *Id.* at 4.

[17] *Id.* at 6.

No. 14-1119 7

would provide protection services. Near the end of the meeting, Danny told Mr. Smith that the upcoming run would be between Indianapolis and Merrillville, Indiana. Mr. Smith stated that he was "ready to get this…first one over and done with so we can move on to bigger and better things."[18] Danny again told Mr. Smith that he could change his mind, and Mr. Smith responded that he had no intention of backing out, stating, "We'll go to Merrillville right now."[19]

Mr. Smith accompanied Danny on two runs, during which they picked up a total of twenty-five kilograms of what Mr. Smith believed to be cocaine. During both trips, Mr. Smith drove Danny's car and carried high-powered firearms. During the first run, Mr. Smith offered to sell pistols to the drug dealer, a second undercover agent, so that the dealer then could smuggle the firearms into Mexico. During the second trip, Mr. Smith showed that same agent photos of an AK-47 and handguns as well as a video of a weapon with a twenty-five-round capacity. The two then discussed prices for the weapons. One week later, Mr. Smith met the purported drug dealer and sold him thirteen firearms for $8,000.

**2.**

A grand jury indicted Mr. Smith for one count of conspiring to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1)

---

[18] Gov't Ex. 80, pt. 2, at 17.

[19] *Id.* at 18.

USDC IN/ND case 2:11-cr-00053-PPS-APR document 183-1 filed 09/16/15 page 8 of 18

and 846; two counts of attempting to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; one count of transferring firearms knowing that they would be used in a drug trafficking crime, in violation of 18 U.S.C. § 924(h); and three counts of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Prior to trial, the district court granted the Government's motion to dismiss one count of possessing a firearm in furtherance of a drug trafficking crime.

At trial, Mr. Smith argued that he was entrapped by Roberson and the government agents. He testified that Roberson had begged him incessantly to get involved in the scheme as a way to help pay off Roberson's drug debts and to shield Roberson's children from harm. Roberson denied Mr. Smith's claims. The district court instructed the jury on the elements of an entrapment defense, explaining that the Government must prove either that the agents "did not persuade or otherwise induce the Defendant to commit the offense," or that "[t]he Defendant was predisposed to commit the offense before he had contact with law enforcement officers."[20] The jury found Mr. Smith guilty of all counts, rejecting his defense that he was entrapped.[21]

---

[20] R.145 at 207.

[21] After the jury rendered its verdict, the district court granted Mr. Smith's motion for a judgment of acquittal for his conviction of transferring firearms knowing that they would be used in a drug trafficking crime, deciding that the Government had failed to provide sufficient evidence to prove the offense as described in the indictment.

USDC IN/ND case 2:11-cr-00053-PPS-APR document 183-1 filed 09/16/15 page 9 of 18

At sentencing, the court concluded that Mr. Smith had obstructed justice by threatening his accomplice Carlyle before trial and by falsely telling the jury that Roberson had elicited his services to work off Roberson's drug debt. The court sentenced Mr. Smith to the mandatory minimum sentence of 480 months' imprisonment.[22] Mr. Smith appeals his conviction.[23]

## II

## DISCUSSION

Mr. Smith contends that the Government violated his right to due process of law by soliciting him to participate in a fictional drug transaction completely operated by undercover agents. He relies on *United States v. Russell*, 411 U.S. 423 (1973), and its progeny. He acknowledges that he did not raise this argument before the district court, and therefore we review for plain error. *See United States v. Duncan*, 896 F.2d 271, 275 (7th Cir. 1990).

The Supreme Court has left open the possibility that there are limits to the Government's authority to create illegal activity in the course of an investigation. In *Russell*, the Court addressed whether government conduct, standing alone, can violate a defendant's right to due process of law. In that case, the defendant argued that the Government's "involvement in the manufacture of the methamphetamine was so high that a criminal prosecution for the drug's manufacture violates the fundamental principles of due

---

[22] The district court had jurisdiction under 18 U.S.C. § 3231.

[23] Our jurisdiction is secure under 28 U.S.C. § 1291.

process." *Russell*, 411 U.S. at 430. The Supreme Court rejected that contention, holding that, under the facts of the case, the Government's conduct was not objectionable. *See id.* at 431–32. The Court noted that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," but concluded that "the instant case [was] distinctly not of that breed." *Id*. The Government's conduct stopped "far short of violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause." *Id.* at 432 (internal quotation marks omitted).

The Court revisited the issue in *Hampton v. United States*, 425 U.S. 484 (1976), and a plurality of the Court suggested that a defendant's remedy for improper government conduct lies either in the entrapment defense or in state and federal statutes, and not in the Due Process Clause. *See id.* at 489–90 (plurality opinion). The plurality explained:

> If the result of the governmental activity is to implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission, the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.

No. 14-1119                                                                 11

*Id.* at 490 (alteration omitted) (citation omitted) (internal quotation marks omitted). However, in a concurring opinion joined by Justice Blackmun, Justice Powell stated that he was "unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles."[24] *Id.* at 493 (Powell, J., concurring). The Supreme Court, therefore, never has laid to rest whether, and in what circumstances, government misconduct requires the dismissal of an indictment against a criminal defendant.

Our early cases expressed skepticism about the validity of the "outrageous government conduct" defense. *See, e.g., Duncan*, 896 F.2d at 275, 277 (noting that the doctrine's validity was questionable and concluding that the district court did not commit plain error in refusing to recognize an "outrageous governmental conduct" defense); *United States v. Belzer*, 743 F.2d 1213, 1216–20 (7th Cir. 1984) (holding that the Government's conduct was not outrageous and therefore

---

[24] Justice Powell quoted at length the view of Judge Friendly:

> "[T]here is certainly a [constitutional] limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction."

*Hampton v. United States*, 425 U.S. 484, 493 n.4 (1976) (Powell, J., concurring) (alterations in original) (quoting *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973) (footnote omitted)).

did not violate due process). More recently, we have said that the defense "does not exist in this circuit."[25] *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995). In *Boyd*, we explicitly rejected the "intimations that 'outrageous governmental misconduct' is an independent ground for ordering a new trial." *Id.* Our rejection of the defense was premised in part on the Supreme Court's instruction in *United States v. Hasting*, 461 U.S. 499 (1983), that "we are not to reverse convictions in order to punish prosecutors."[26]

---

[25] Based on the Supreme Court's statements in *Russell*, some circuits have recognized and applied an "outrageous government conduct" defense. *See, e.g.*, *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (noting that only two reported decisions by federal appellate courts have reversed convictions under this doctrine). Other circuits, including our own, have rejected the defense outright. *See United States v. Amawi*, 695 F.3d 457, 483 (6th Cir. 2012) ("This court has soundly rejected the 'outrageous government conduct' defense…."). Most circuits, however, have left the matter open. *See, e.g.*, *United States v. Dyke*, 718 F.3d 1282, 1287 (10th Cir. 2013) ("Others [sic] circuits still, and we find ourselves in this camp, recognized the doctrine's potential viability in the immediate aftermath of *Russell* and have so far declined to inter it formally, even while they have yet to find a single case where the defense applies.").

[26] The Supreme Court, on multiple occasions, has held that it is inappropriate to dismiss an indictment based on prosecutorial misconduct in the absence of prejudice to the defendant. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988) ("We conclude that the District Court had no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct."); *United States v. Hasting*, 461 U.S. 499, 506 (1983) ("Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error."); *United States v. Morrison*, 449 U.S. 361, 365 (1981) ("More particularly, absent demonstrable prejudice, or substantial threat

(continued…)

No. 14-1119                                                                 13

*Boyd*, 55 F.3d at 241 (citing *Hasting*, 461 U.S. at 506–07). We repeatedly have reaffirmed our decision not to recognize the defense.[27]

Although we recognize that the Supreme Court has not closed the door entirely on this matter, this case certainly does not present us with an opportunity to reconsider our position. Instead, this case, in which the Government simply provided the defendant with the opportunity to commit an offense, is governed by the basic principles of entrapment. We have long recognized that, when an individual is ready and willing to engage in illegal activity, the fact that the Government affords him an opportunity to commit the crime provides no legal impediment to prosecution. *See*

---

(…continued)
thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."); *accord United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) ("Prosecutorial misconduct may precipitate a reversible error, but it is never in itself reversible error.").

[27] *See United States v. Westmoreland*, 712 F.3d 1066, 1071 (7th Cir. 2013) (noting that, without real guidance from the Supreme Court, "our court has disallowed such a defense in this circuit"); *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) (noting that there was "a fatal problem with [the defendant's argument]: Outrageous government conduct is not a defense in this circuit"); *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008) (noting that "this circuit clearly and consistently has refused to recognize any defense based on…asserting 'outrageous government conduct'"); *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006) (noting that we had "never taken what we see to be an extreme step of dismissing criminal charges against a defendant because of government misconduct"); *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003) (noting that this court "flatly rejected the doctrine" of outrageous government conduct).

*United States v. Mayfield*, 771 F.3d 417, 431 (7th Cir. 2014) (en banc) (noting that the "fundamental principle in entrapment law that the government's offer of a run-of-the-mill opportunity to commit the charged crime isn't entrapment" "has been around from the beginning"); *see also United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013) (recognizing that "the [outrageous government conduct] defense has come into play only where the government's involvement created a crime or criminal enterprise that did not exist before, and where the government had to coerce the defendant to commit the crime by some unreasonable means"); *Belzer*, 743 F.2d at 1217 (requiring inducement that was "exceedingly generous or in some other way excessively coercive" (citation omitted) (internal quotation marks omitted)); *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir. 1983) ("Granting that a person is predisposed to commit an offense, we think that it may safely be said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process…." (internal quotation marks omitted)). We similarly have recognized that "[t]he use of informants and the offer of a reasonable inducement are proper means of investigating crime." *Kaminski*, 703 F.2d at 1009.

The evidence presented at trial clearly demonstrates that the Government did not induce Mr. Smith to commit the crime, *see Mayfield*, 771 F.3d at 434–35 (defining inducement as "government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do

No. 14-1119                                                                 15

so in response to the government's efforts"[28] (emphasis in original)); rather, he was a ready and willing participant in the illicit transactions. Although Mr. Smith testified that Roberson induced him to enter into the criminal transaction in order to protect Roberson's family, both the jury and the district court, through its conclusion that Mr. Smith obstructed justice by testifying falsely, found that Mr. Smith's testimony was incredible. Instead, the jury credited Roberson's testimony denying Mr. Smith's claims. Aside from Mr. Smith's discredited testimony, there is no evidence that Mr. Smith otherwise was induced to commit the crime. *Cf. United States v. Blitch*, 773 F.3d 837, 845 (7th Cir. 2014) (noting that the Government's "offer was a take-it-or-leave-it proposition" and that the Government did "nothing more than make a stash house robbery available"); *Stallworth*, 656 F.3d at 730 (noting "that there is nothing inherently outrageous about conducting a sting operation").

Instead, the evidence demonstrates that Mr. Smith actively sought out the criminal activity. *See Mayfield*, 771 F.3d at 438 (holding that "a defendant is predisposed to commit the charged crime if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means"). Roberson testified that, prior to the ATF's investigation, Mr. Smith told him that he needed

---

[28] "The 'other conduct' may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, [or] pleas based on need, sympathy, or friendship…." *United States v. Mayfield*, 771 F.3d 417, 435 (7th Cir. 2014) (en banc).

USDC IN/ND case 2:11-cr-00053-PPS-APR document 183-1 filed 09/16/15 page 16 of 18

money and asked Roberson whether he knew anyone who was "doing big time drug dealing, or transporting" and discussed the possibility of providing security for them.[29] Mr. Smith also asked Roberson if he knew the location of any stash houses so that they "could gear up and go in as police and rob the house."[30] Roberson stated that he and Mr. Smith discussed robbing stash houses several times. In addition, Detective Anderson testified that she contacted the ATF because Roberson had told her that Mr. Smith "began talking about doing security for drug dealers or robbing them and selling the product."[31]

The remaining evidence reveals that, when presented with the opportunity, Mr. Smith jumped at the prospect of regularly providing security for large-quantity drug transactions. *See Blitch*, 773 F.3d at 845 ("Carwell's predisposition is aptly demonstrated by his overwhelming enthusiasm for the venture."); *Stallworth*, 656 F.3d at 726 (rejecting the defendant's entrapment defense because he "showed no reluctance in participating and profiting from the deal"). During Mr. Smith's first meeting with the undercover ATF agent, Mr. Smith repeatedly expressed his interest in making money and attempted to gain the agent's trust. Mr. Smith then suggested that he, Roberson, and the undercover agent "ought to sit down and talk about how we can—how we can best make some…money between the

---

[29] R.142 at 126.

[30] *Id.* at 127.

[31] *Id.* at 70.

No. 14-1119                                                                 17

three of us."[32] When the agent responded that he was not interested in legitimate business, Mr. Smith responded, "whatever you want to do."[33]

During their subsequent meetings, Mr. Smith continually expressed his interest in making money by providing security for the agent. When first asked about providing security for the agent during a specific trip, Mr. Smith expressed his enthusiasm by responding, "Tell me where you want to go and when."[34] Mr. Smith assured the agent that he was well-equipped with firearms to provide adequate protection and that he was not afraid to resort to violence, stating that he would "kill a motherf***er just as quick as they're standing there."[35] Later, during a conversation with Roberson after having discussed working with the undercover agent, Mr. Smith stated that he would be "glad when [the agent] starts calling so we can start making some…money."[36]

Mr. Smith's statements and conduct demonstrate that, far from being coerced to commit the crimes, Mr. Smith was a willing, if not enthusiastic, participant in the criminal activity.

---

[32] Gov't Ex. 8c, at 3.

[33] *Id.*

[34] Gov't Ex. 8f, pt. 1, at 5.

[35] *Id.* at 7.

[36] R.142 at 138.

18                                                              No. 14-1119

### Conclusion

Because we do not recognize outrageous government conduct as cause for dismissing an indictment, Mr. Smith's challenge to his conviction fails. In any event, the evidence reveals that Mr. Smith jumped at the opportunity to make money by providing protection for individuals involved in the illicit drug trade and that he was an active and enthusiastic participant throughout the sting operation. The district court, therefore, did not commit plain error by failing to dismiss Mr. Smith's indictment on account of the Government's conduct. The judgment of the district court is affirmed.

AFFIRMED